[Cite as *In re D.W.*, 2026-Ohio-1442.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: D.W.

C.A. No.     31586

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 23 08 0696

DECISION AND JOURNAL ENTRY

Dated: April 22, 2026

HENSAL, Judge.

{¶1}     Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that granted legal custody of her child to third parties. This Court affirms.

I.

{¶2}     Mother and Father are the biological parents of D.W., born February 10, 2023. Father was in prison when D.W. was born, and paternity was not established until the child was ten months old.

{¶3}     Mother tested positive for amphetamines at the child's birth. She admitted that she had used methamphetamine during her pregnancy, had not obtained any prenatal care, and had no supplies for the baby. Mother had been convicted of felony aggravated possession of drugs in 2017, was under indictment for another charge of aggravated possession, and there was a pending warrant for her arrest in a theft case. She lost custody of two older children to their father in a 2018 dependency case based on Mother's substance abuse issues. At the time of D.W.'s birth,

Mother was living with a boyfriend who also had a criminal history involving drug convictions. Their housing situation was unstable. Based on these concerns, Summit County Children Services Board ("CSB" or "the agency") began providing family preservation services with Mother's agreement.

{¶4} Mother cooperated with the agency for one week, maintaining contact with her caseworker and attending Women's Recovery Group ("WRG") meetings at Community Health Center ("CHC"). During the next two months, the caseworker made multiple announced and unannounced home visits, left voicemail messages, and spoke to several family members and a community agency in efforts to reach Mother, all without success. The agency received reports that Mother was living at various addresses. Because the caseworker could not verify the status and safety of the infant, CSB filed a complaint alleging that D.W. was an abused, neglected, and dependent child; and requesting an order of access to assess Mother's home, random drug testing of Mother and her boyfriend, and protective supervision of the child.

{¶5} Five days later, after confirming Mother's address and conducting a home visit, CSB filed an amended complaint containing additional factual allegations. Although D.W. appeared healthy, Mother tested positive for an extremely high level of methamphetamine and a low level of THC. Mother's live-in boyfriend refused to answer any questions or submit to a drug swab. Given Mother's disappearance for two months, ongoing use of methamphetamine, and the caseworker's inability to ascertain Mother's boyfriend's suitability to care for the child, CSB removed D.W. under an emergency order of temporary custody.

{¶6} After a hearing, the juvenile court adjudicated D.W. a dependent child under Revised Code Section 2151.04(D)(1)(2), based on the prior adjudications of the child's siblings, those circumstances, and the current conditions in Mother's home that placed the child in danger

of being abused or neglected. Mother appealed that judgment, and this Court affirmed the child's dependency. *In re D.W.*, 2025-Ohio-246, ¶ 1, 23 (9th Dist.).

{¶7} Mother and Father waived their rights to a dispositional hearing and stipulated to orders awarding temporary custody of the child to CSB and adopting the agency's case plan. The case plan required Mother to obtain substance use and mental health assessments, follow all recommendations, submit to random drug screens, sign releases of information, resolve all pending criminal matters and refrain from engaging in further criminal acts, and demonstrate the ability to meet the child's basic needs. Because Father was in prison, the agency required him to provide information about family members interested in placement of the child and to cooperate with any home studies.

{¶8} After the first and second review hearings, the juvenile court found that Mother had made no progress on her case plan objectives. She failed to obtain substance use and mental health assessments, began refusing to submit to drug screens after consistently testing positive for methamphetamine use over six months, had not resolved a pending warrant, was evicted from her home, and could not verify her claimed income. Father had been released from, but quickly returned to, prison. CSB had approved the paternal grandmother ("Grandmother") and her long-term partner ("Mr. B.") for placement, and the child was doing well in that home.

{¶9} Thereafter, CSB filed a sunset dispositional motion requesting a first six-month extension of temporary custody. The agency alleged that, although Mother had still not complied with her case plan objectives and was not a viable option for custody then or in the foreseeable future, Father was out of prison, cooperating, and building a relationship with the child. After a hearing, the juvenile court granted an extension of temporary custody to CSB.

{¶10} Five months later, CSB amended the case plan because Father had once again returned to prison. In addition to the original goal of reunification, the agency added a concurrent permanency plan for legal custody to Grandmother and Mr. B. Shortly thereafter, CSB moved for legal custody of D.W. to those third parties. No other party filed a dispositional motion.

{¶11} At the hearing, Father waived his right to contest and indicated his agreement with CSB's motion. After the hearing, the magistrate granted the agency's motion and ordered parental visitation. Mother objected to the decision on evidentiary grounds. The juvenile court overruled Mother's objection, finding that it was in D.W.'s best interest to be placed in the legal custody of Grandmother and Mr. B. (collectively, "Custodians"). The trial court granted CSB's motion and reiterated the magistrate's visitation order. Mother timely appealed and now raises one assignment of error for review.

II.

## ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN GRANTING LEGAL CUSTODY TO [GRANDMOTHER AND MR. B.] AS SAME WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT IN THE BEST INTEREST OF THE CHILD.

{¶12} Mother argues that juvenile court's award of legal custody to Grandmother and Mr. B. is against the manifest weight of the evidence. This Court disagrees.

{¶13} Our standard of review for such challenges is well settled:

On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.).

**{¶14}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

**{¶15}** "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.). In that regard, the juvenile court is guided by the best interest factors enumerated in Revised Code Section 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.).

**{¶16}** The best interest factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in Section 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.). In addition, the juvenile court may also look to the best interest factors in Section 3109.04(F)(1) for guidance. *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of

providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶17} D.W. was two years old at the time of the hearing. She spent the first six months of her life in Mother's care before CSB removed her and placed her in a foster home briefly before approving Grandmother and Mr. B. for placement. D.W. continued to live with them for the duration of the case.

{¶18} The child is closely bonded with Grandmother and Mr. B. She is comfortable in their home where all her needs are met. They have both strived to facilitate parental visitation and testified that they want D.W. to have an ongoing relationship with her parents.

{¶19} The child has an established bond with both Mother and Father. Although Father was incarcerated for much of the time the case was pending, he had nearly daily contact with D.W. during the three months he was out of prison. Mother had the opportunity to visit with the child twice a week on Mondays and Wednesdays, although she was frequently late and missed most Monday visits. The caseworker and guardian ad litem each testified that, when Mother attended her visits, there were no concerns about her interactions with the child.

{¶20} After spending most of her life in custodial limbo, D.W. needed a legally secure permanent placement. Father did not dispute the testimony of the caseworker and guardian ad litem that he could not provide an appropriate home for the child then or in the foreseeable future. The evidence established that Mother was also not able to provide D.W. with a safe and stable permanent home.

{¶21} The caseworker testified that Mother had not remedied the concerns underlying the child's removal from home, as she had not made meaningful progress on her case plan objectives.

Although Mother had resolved her prior criminal cases and had no currently pending charges, she had made negligible progress addressing the concerns regarding substance abuse, mental health, and basic needs.

{¶22} Mother obtained a substance abuse assessment at CHC while working voluntarily with CSB before the agency filed its complaint. The assessor recommended that Mother participate in WRG. Mother attended two or three sessions before disengaging with CHC. The caseworker encouraged Mother to reengage with CHC, particularly because that agency could accommodate her dual diagnosis substance abuse and mental health needs. When Mother declined, the caseworker made a referral to Affect, an online substance abuse provider. Mother worked only briefly with Affect. The caseworker then made a referral to CommQuest, a dual diagnosis treatment provider local to where Mother and her boyfriend had moved. Mother agreed to pursue that referral but quickly rejected it, reporting that her work hours conflicted with the service hours. The caseworker gave Mother a list of five or six area providers with evening and weekend hours, but Mother did not follow through with any of them.

{¶23} Three months before the hearing, Mother told the caseworker that she had engaged in substance abuse services with Brightside Health, another online provider. Mother refused to sign a release, however, for the caseworker to obtain information regarding the services, as well as Mother's engagement and progress. Although she told the caseworker that she was no longer using drugs, Mother could not provide a sobriety date. She consistently tested positive for methamphetamine from October 2023 through April 2024, after which time she refused the caseworker's requests for drug swabs. Although Mother reported that she was willing to submit to urine screens at CHC, she never went when asked. The case plan is clear that the agency presumes that any refused drug screening would be positive for substance use. Given Mother's

consistently positive drug screens, failure to follow through with treatment services, and lack of cooperation to allow the caseworker to verify Mother's reported current engagement with Brightside, the caseworker testified that Mother had not complied with her substance abuse case plan objective to remedy those concerns.

{¶24} As for compliance with her mental health objective, Mother believed she had satisfied all requirements. Although she testified that she had been seeing a therapist online for the past four months, Mother conceded that that was more for substance use issues. In any event, Mother had not executed a release of information for the caseworker and guardian ad litem to gather information from the provider at Brightside.

{¶25} The caseworker testified that she made mental health referrals for Mother at CommQuest and CHC, two providers able to accommodate dual diagnosis (mental health and substance use) clients. Mother did not follow through with either provider. The caseworker testified that Mother last engaged in mental health services a year and a half earlier when she saw a psychiatrist who prescribed a medication. Mother quickly stopped taking the medication because she did not like how it made her feel. She did not engage in further mental health or medication management services, testifying that she did not believe she needed them. The guardian ad litem opined that Mother did not recognize the connection between her mental health and substance abuse issues. Based on Mother's lack of engagement in mental health services, the caseworker testified that Mother failed to comply with that case plan objective.

{¶26} As to basic needs, the evidence demonstrated that Mother and her boyfriend moved multiple times during the case after initially being evicted from the home her boyfriend was renovating in lieu of paying rent. Mother finally obtained independent housing one month before the hearing. She notified the caseworker a few weeks later, leaving the caseworker unable to visit

the home in advance of the hearing. She had not been in contact with the guardian ad litem who only learned of Mother's new home during the caseworker's testimony.

{¶27} Mother testified that her home has two bedrooms, so the child will have her own room. Mother's rent in her subsidized housing is set at 30% of her earned income. Although only Mother is on the lease, her boyfriend lives in the apartment with her. While Mother testified that she checked to ensure that D.W. would be allowed to live with her, she was not sure if her boyfriend is allowed to reside in her home. The guardian ad litem expressed concerns that Mother is at risk of losing her subsidized housing by allowing an unauthorized resident in the home.

{¶28} Both the caseworker and guardian ad litem had additional concerns regarding Mother's relationship with her boyfriend and the risk he posed to the child. He regularly tested positive for methamphetamine and other drugs and had two recently issued active warrants for his arrest. The boyfriend's use of drugs posed dangers to Mother's sobriety, the child's health should she come into contact with them, and the family's housing stability.

{¶29} While Mother could afford her subsidized rent, the guardian ad litem opined that she would not be able to afford a market rate rent if she were evicted for violating the terms of her lease. Mother works only 12-16 hours a week cleaning and doing yardwork for a renovation company, although she testified that she "feels" she works more. The caseworker verified Mother's typical hours with her employer who reported that Mother is a hard worker when she is on the job. The employer's concern, however, was that Mother would often not answer her phone or would make excuses as to why she was unable to take a job assignment. Although the caseworker acknowledged that Mother had housing and an income, she maintained concerns for ongoing stability and the physical state of the home given her inability to visit and assess prior to the hearing. The guardian ad litem was more direct in his ongoing concerns about Mother's ability

to provide for the child's basic needs given her inability to demonstrate a pattern of stability and her failure to recognize the risks her boyfriend posed to her stability and the child.

{¶30} The evidence demonstrated that Grandmother and Mr. B. had been providing a safe, stable, and appropriate home for D.W. The child has her own bedroom, has a strong bond with Custodians, and looks to them for comfort. Grandmother and Mr. B. meet the child's needs and are willing and able to continue to do so throughout D.W.'s minority. The caseworker and guardian ad litem testified that they had no concerns regarding the child's care and well-being in Custodians' home.

{¶31} At two years old, D.W. lacked the maturity to express her wishes regarding custody. The guardian ad litem opined that an award of legal custody to Grandmother and Mr. B. was in the child's best interest.

{¶32} All parties acknowledged the bond between Mother and the child and the importance of maintaining that bond. Custodians both testified that they wanted D.W. to have a relationship with Mother and that they would continue to facilitate regular visitation. While Mother complained that she felt she did not have enough time with the child, Mother missed or arrived late for many visits due to her own issues, not the fault of the agency or caregivers. In fact, the caseworker testified that Mother had missed her visit the day before the hearing, claiming she had overslept. Mr. B. testified that he and Grandmother have worked with Mother to set up visits, only to have Mother fail to arrive.

{¶33} Based on a thorough review of the record, this is not the exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody of D.W. to Grandmother and Mr. B. Mother has a long history of substance abuse that resulted in the loss of custody of two older children and led to the removal of D.W. Despite

intervention by CSB and multiple referrals for services, Mother failed to engage in treatment or otherwise address her substance abuse issues. Moreover, she has maintained a relationship with her live-in boyfriend who also abuses substances and engages in criminal activities. It is reasonable to infer that Mother's drug use impacts her judgment regarding her associates, as well as her stability. She routinely misses visits and employment opportunities and has put her subsidized housing at risk by allowing an unauthorized adult to reside with her therein. Mother has not addressed the concerns regarding her mental health and does not recognize the connection between her struggles with mental health and substance abuse. The evidence demonstrates that Mother cannot provide a safe, stable, and appropriate home for D.W. On the other hand, Grandmother and Mr. B. have demonstrated a commitment to the child, meeting her needs, and recognizing the importance of allowing D.W. to maintain a relationship with her parents. Under these circumstances, the juvenile court's finding that an award of legal custody to Grandmother and Mr. B was in the child's best interest is not against the manifest weight of the evidence. Mother's assignment of error is overruled.

III.

{¶34} Mother's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

FLAGG LANZINGER, P. J.
STEVENSON, J.
CONCUR.

APPEARANCES:

RONALD T. GATTS, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and ASHLEE JAMES, Assistant Prosecuting Attorney, for Appellee.

LEONARD BREIDING, Attorney at Law, for Father.

JASON JORDAN, Guardian ad Litem.